Kimberly Ann ADAMSON,
Petitioner–Appellant,

v.

John Elza ADAMSON, Respondent–
Respondent.

No. 21485.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 9, 1998.

Lisa A. Ghan, Thomas M. Benson, Lowther, Johnson, Joyner, Lowther, Cully & Housley, L.L.C., Springfield, for Petitioner–Appellant.

John Cowherd, Stemmons, Stemmons & Cowherd, Mt. Vernon, for Respondent–Respondent.

SHRUM, Judge.

Kimberly Ann Adamson (Ex–Wife) appeals from a judgment that quashed her request for an income assignment and terminated her right to maintenance from John Elza Adamson (Ex–Husband) as per their separation agreement and decree of dissolution. The trial court's adjudication is based on a finding that Ex–Wife was "cohabitating [sic] with an unrelated adult." This court affirms.

### FACTS

When their marriage was dissolved in August 1995, Ex–Husband agreed to pay Ex–Wife monthly maintenance "for a period of two years ... or until [Ex–Wife] ... cohabitates [sic] with an unrelated adult ... whichever [event] occurs first." That agreement was incorporated into their decree of dissolution.

In December 1996, Ex–Wife filed an "Application To Effect Assignment." As part of this filing, Ex–Wife filed documents claiming Ex–Husband owed over $3,500 in delinquent maintenance. Ex–Husband moved to quash Ex–Wife's request, alleging that he no longer owed maintenance because Ex–Wife had violated the cohabitation clause.

A hearing on these motions established that Ex–Wife had been dating Douglas Scott Jander ("Boyfriend") since September 1995. During their relationship, Boyfriend worked at Columbia, Illinois, for Phillips Environmental Services Corp. As "construction manager" for that firm, Boyfriend was an overseer of "out-of-town work," i.e., "tank removals." This job required Boyfriend to travel "very extensively" in 1993

and 1994, but less in 1995 and 1996. Boyfriend said that he now traveled "a third to a half" of the time. Ex–Wife said Boyfriend traveled "some" and that his job took him "all over" the country. At the time of the hearing, Boyfriend stayed with his mother in Kirkwood, Missouri, and commuted to his place of work in Columbia, Illinois, during the work week when he was not traveling.

The relationship between Ex–Wife and Boyfriend developed to the point that they were with each other except when he was working and unable to commute to Springfield on a daily basis. They began spending all weekends together and vacationed together, once for "10, 11 days" in Florida and another time in Arkansas. In June 1996, Ex–Wife and Boyfriend bought a house in Springfield, Missouri, taking title as joint tenants. They borrowed $72,033 in order to purchase this property. The deed of trust given as security for the loan recited that the borrowers (Ex–Wife and Boyfriend) "shall occupy, establish and use the Property as Borrower's principal residence within sixty days after execution of this Security Instrument...." After buying the home, Boyfriend used a week of his vacation to help Ex–Wife move into their new home. Moreover, he personally helped in making repairs to the home, which included building a closet in the basement.

As early as June 1996, Boyfriend and Ex–Wife were having sexual relations together, often in their newly acquired home. Asked if she and Boyfriend had sexual relations "on a frequent basis or just a regular basis," Ex–Wife answered: "Yes." Although Boyfriend and Ex–Wife denied they were engaged or planned marriage, they went "together" to buy her a "promise ring." As Ex–Wife explained it, she sold a ring "[f]rom my previous marriage" but used the diamond therefrom in the promise ring. Each paid $500 toward this ring. Ex–Husband testified that Ex–Wife told him that she and Boyfriend intended to marry but this had not yet happened because "Scott still had [some jobs] to do in St. Louis."

Testimony about where Boyfriend and Ex–Wife spent their weekends conflicted. Ex–Wife claimed Boyfriend was at their house in Springfield "usually about four or eight times a month[,]" arriving "late Friday" and leaving "late Sunday." She indicated that he was in Springfield probably "60–40," meaning he came to Springfield on sixty percent of the weekends and she went to St. Louis on the other weekends. However, Boyfriend stated that "in ... the last three months," Ex–Wife visited him in St. Louis only "once or twice."[1] Ex–Husband testified that for the past "three or four months" he "kept tabs" on when Boyfriend was in Springfield and found him there "every weekend."

Before Boyfriend met Ex–Wife, he traveled extensively and stayed at his mother's condominium when he "was in town between projects." That arrangement continued after he started dating Ex–Wife, except that he began spending his weekends with Ex–Wife. At the time of the hearing, he received all of his mail at the Kirkwood address, he was registered to vote in the County of St. Louis, and he paid personal property tax in St. Louis County. He paid none of Ex–wife's living expenses nor did he assist with the monthly mortgage payments on their jointly-owned house.

The trial court found that Ex–Wife and Boyfriend were cohabiting within the meaning of the decree and terminated Ex–Husband's obligation to pay maintenance as of June 1996. Accordingly, it quashed Ex–Wife's request for an income assignment. This appeal followed.

### STANDARD OF REVIEW

We review this case under the standards set forth in *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976). "We will affirm the trial court's judgment unless that judgment is against the weight of the evidence, erroneously declares the law, or erroneously applies the law." *Id.* at 32[1]. "This court accepts as true the evidence and inferences favorable to the trial court's judgment." *Barr v. Barr,* 922 S.W.2d 419, 420[1] (Mo.App.1996).

### DISCUSSION AND ANALYSIS

*Point I: Plain And Ordinary Meaning Of The Term "Cohabit"*

■ Ex–Wife's first point on appeal charges that the trial court failed to correctly

---

1. This hearing was held January 22, 1997.

apply the law or misapplied the law when it quashed her request for income assignment. She argues that in finding that she and Boyfriend were "cohabiting," the trial court failed to apply the plain and ordinary meaning of that term. We disagree.

"The normal rules of contract construction apply to settlement agreements." *Daily v. Daily*, 912 S.W.2d 110, 114[9] (Mo.App.1995). "When the language of a provision is in dispute, the court must determine the parties' intent as manifested in the document itself and not by what the parties say they intended." *Id.* at 114[10]. "This is done by giving the words of the agreement their plain and ordinary meaning as understood by a reasonable and average person." *Id.* at 114[11].

The court of appeals has determined the intent expressed in a similar agreement. In *Barr*, 922 S.W.2d at 419, the parties agreed that husband's maintenance obligation would terminate "upon wife's 'conjugal cohabitation' with [an] adult male for a period of 60 days...." Husband moved for relief from his maintenance obligation based on this provision. The trial court sustained husband's motion. On appeal the western district affirmed, saying:

> "[Wife] points to evidence that [boyfriend] had a separate residence in Tucson, did not commingle funds with [wife] and did not contribute to household expenses. She argues that to establish 'conjugal cohabitation' requires more than occasional or even frequent overnight visits, but circumstances such that a court can view the relationship as a substitute for the married state, or as analogous to marriage."
>
> ....
>
> "The plain language of the agreement does not call for the interpretation proposed by [wife] that she must have had a live-in companion at her home who was held out as a spouse. Without resorting to a dictionary definition of the words 'conjugal' and 'cohabitation,' what [wife] and [boyfriend] did in Tucson satisfied the maintenance termination clause. They admittedly had sex, and he kept clothing and numerous personal items at her home. [Boyfriend] spent ten to twelve nights a

month there when he was not on the road, as compared to one night a month at his 'company rental unit.' Despite the pretense of [boyfriend's] maintaining a separate residence, the evidence supports the trial court's finding that [boyfriend] was cohabiting with [wife] in [wife's] house.... *The plain language chosen by the parties does not require that the couple hold themselves out to be married or share expenses. Similarly, the language does not demand that [boyfriend] not have another address.* ... The testimony of the child made more apparent the fact that [boyfriend] was at [wife's] residence almost all the time."

*Id.* at 421. (emphasis added).

Ex–Wife says that this case differs from *Barr* because there is no evidence that Boyfriend kept personal effects at Ex–Wife's home nor is there evidence that Boyfriend spent the majority of his time at Ex–Wife's house. In part, this is true. The only evidence concerning Boyfriend's clothing was that he brought what he needed for weekend visits and there is no evidence that he spent the "majority" of his time at Springfield with Ex–Wife.

However, the plain language of the agreement does not call for the interpretation proposed by Ex–Wife that the parties "actually live together" the majority of the time or "maintain the same residence," or that both parties keep personal property in the home where they spend time together. Ex–Wife's interpretation ignores the realities of our mobile society. Many jobs require cohabitants and married couples to be physically apart for days, weeks, or even months at a time. Yet, a man and woman can be "living with each other" as that phrase is understood by reasonable and average people when they stay with each other and maintain a sexual relationship as often as their respective jobs will permit.

We need not, and do not, quantify what percentage of time a man and a woman must spend together in a sexual relationship in order to hold, as a matter of law, that they are cohabiting. In addition, we need not decide what amount of personal property a cohabitant must keep in a specific residence.

We do hold, as a matter of law, that when a man and woman spend as much time together as their respective jobs allow, regularly engage in sexual relations when they are together, purchase a home together (taking title as joint tenants), and sign a deed of trust declaring their intention to "occupy, establish and use the [p]roperty as [their] principal residence" such people are "cohabiting" as that word is understood by reasonable people. Point I is denied.

*Point II: Sufficiency Of Evidence*

■ Ex-Wife's second point contends the trial court's finding that she and Boyfriend were cohabiting was against the weight of the evidence. Again, we disagree.

At trial, Ex–Wife testified that she and Boyfriend were involved in a sexual relationship. The evidence at trial also established that Ex–Wife and Boyfriend spent time together at Ex–Wife's Springfield home. In a letter to both counsel for Ex–Wife and Ex–Husband, the trial court stated that the evidence indicated Boyfriend had been spending the night with Ex–Wife eight to ten times a month. Ex–Husband testified that, based on his observations, Boyfriend had been spending every weekend with Ex–Wife since September 1996. The trial court apparently reasoned that every weekend would amount to eight to ten days per month.

While Ex–Husband's testimony conflicts with that of Ex–Wife and Boyfriend, the trial court assessed witness credibility and was free to believe all, part, or none of any witness' testimony. *Ritter v. Ritter,* 920 S.W.2d 151, 159[18] (Mo.App.1996). We give deference to the trial court's assessment of witness credibility. *Willyard v. Willyard,* 719 S.W.2d 91, 93 (Mo.App.1986); Rule 73.01(c)(2).

At trial, there was uncontradicted evidence that Ex–Wife and Boyfriend held title to Ex–Wife's house as joint tenants with right of survivorship. Further uncontradicted evidence showed that Ex–Wife and Boyfriend each signed a deed of trust as borrowers. The deed of trust included the following:

"Borrower shall occupy, establish, and use the [p]roperty as Borrower's principal residence within sixty days after the execution of this Security Instrument ... and shall continue to occupy the [p]roperty as Borrower's principal residence for at least one year after the date of occupancy...."

Other evidence at trial demonstrated that Ex–Wife and Boyfriend had jointly purchased a "promise ring" in which the diamond from a ring given to Ex–Wife by Ex–Husband had been mounted. Ex–Husband also testified that Ex–Wife had told him she and Boyfriend were going to be married. While Ex–Wife and Boyfriend denied plans to marry, the trial court could have believed Ex–Husband's testimony and disbelieved contrary testimony.

Taken in the light most favorable to the trial court's judgment, the evidence establishes the following: (1) Ex–Wife and Boyfriend jointly own a house which, under the terms of a deed of trust, must be their primary residence; (2) Boyfriend is present in Ex–Wife's and Boyfriend's house eight to ten days a month; (3) Ex–Wife and Boyfriend maintain a sexual relationship while Boyfriend is present in their house; (4) Ex–Wife's and Boyfriend's relationship is serious enough to warrant the purchase of joint property and contemplation of marriage. We hold the trial court's finding that Ex–Wife and Boyfriend are cohabiting is not against the weight of the evidence. Point II is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and BARNEY, J., concur.